CALOGERO, Justice.
In this case we must decide whether the Missouri manufacturer of a dredge is liable to a longshoreman who was injured while the dredge was in the process of being loaded onto a ship in the port of New Orleans. The basic facts of the case are undisputed.
Dixie Dredge Company of St. Louis, Missouri, built a dredge for use in South America. The dredge was loaded onto a car of the Illinois Central Gulf Railroad and shipped to New Orleans. In New Orleans, Texla Stevedores, Inc., was responsible for loading the dredge onto a National Bulk *1240 Carriers ship. During the loading process a plywood covering over the middle section of the dredge (it was shipped in three parts) collapsed and plaintiff fell into the dredge, injuring himself.
Plaintiff sued all of the companies involved in the manufacture, shipment and loading of the dredge. In addition he sued Commercial Union Insurance Company as the insurer of Edward Cook, plaintiff’s supervisor during the loading operation and a Texla “executive officer”, under Commercial’s liability insurance policy issued to Texla. Mr. Cook died as a result of the same accident in which plaintiff was injured. Prior to trial National Bulk Carriers compromised and settled with plaintiff. Illinois Central Gulf Railroad was dismissed from the suit upon motion for summary judgment.
The bench trial against the two remaining defendants resulted in a judgment in favor of plaintiff against Dixie Dredge Company and Commercial Union Insurance Company in solido in the sum of $179,197.79 of which plaintiff was entitled to receive $175,000.00, the remainder representing a workmen’s compensation lien vested in Commercial Union. Both defendants appealed.
Prior to oral argument in the Court of Appeal, Commercial Union paid $175,000.00 to plaintiff and took a release of all his claims against it, but reserved “all rights, remedies, and causes of action against .. . Dixie Dredge Company and its insurers.” Plaintiff agreed to refund $87,500.00 to Commercial Union in the event Dixie’s appeal was concluded favorably to plaintiff (presumably plaintiff in that event would have been able to recover $87,500.00 from Dixie and, with Commercial Union’s $175,-000.00 reduced by $87,500.00, the respective solidary judgment debtors would each therefore bear one-half of the $175,000.00 judgment).
The parties’ principal arguments in the Court of Appeal related to Dixie’s liability, contributory negligence and quantum.
The Court of Appeal found no reason to address the quantum issue and did not specifically resolve the liability and contributory negligence issues although language in the opinion inferred that, were liability an issue to be reached, the exclusively liable defendant would have been found to be Commercial.[1] Bonura v. Commercial Union Ins. Co., 381 So.2d 1265 (La. App. 4th Cir. 1980).
Rather, the Court of Appeal, concluding that Commercial had “paid the judgment”,[2] treated plaintiff’s pursuit of judgment against Dixie as one in truth where “Cook’s insurer [Commercial] pursues Bonura’s claim, as by subrogation to obtain contribution.” 381 So.2d at 1266. Considering the case in this posture, the Court of Appeal concluded that Dixie was not liable in contract to Commercial (even if both might be liable to Bonura). In other words, there was no merit to Commercial’s third party claim against Dixie. Instead, according to the Court of Appeal, the reverse would be true; if anything the long-shore stevedore owed “Ryan type”[3] indemnity to Dixie, manufacturer and presumed *1241 owner of the dredge and the party with whom Texla contracted to do a workmanlike loading job (although, in fact, there was no contract between Dixie and Texla).
For this reason the Court of Appeal did not reach the question whether Dixie is liable to Bonura. It simply denied “contribution” to Cook’s insurer Commercial. The Court then dismissed the appeal as moot because plaintiff personally no longer had a real interest in the judgment.[4]
Neither party had taken this particular posture in the Court of Appeal in brief or otherwise. In fact, there was no contractual arrangement of any sort between Texla Stevedores and Dixie. Texla’s contract for loading was with National Bulk Carriers. Before this Court, counsel for Dixie concedes as much in brief and admits there is no way that Commercial (Texla) could be held liable to Dixie for Bonura’s injuries, under contract or otherwise, based on Tex-la’s negligent performance of the loading.
On application for rehearing the Court of Appeal recognized that plaintiff did retain a real interest in the judgment because he had not collected from Commercial the legal interest due on the principal amount. It nonetheless denied the application for rehearing for reasons which track the essential rationale of the opinion regarding indemnity, concluding that “Bonura cannot now collect from Dixie because Bonura, by accepting the payment ‘in full satisfaction of the judgment’ as against Cook’s insurer, has defeated Dixie’s right to indemnity against Cook’s insurer.” 381 So.2d at 1268.
The issue which should have been decided in the Court of Appeal and which we address now is whether Dixie is liable to Bon-ura for damages sustained when Bonura and others fell into the dredge.
Dixie built the three section dredge in St. Louis. The center section of the dredge had an open area, approximately 12 feet by 35 feet, which was not covered by a steel deck as were the two end sections. Much of the piping and wiring of the dredge was located in this open area and thus would be exposed to the elements (and perhaps vandals and trespassers). To keep out the elements and intruders Dixie covered the open area with plywood. The 4' X 8' sheets of plywood were supported by 2" X 4"’s running the width of the opening and placed on four foot centers. These 2" X 4"’s were supported in the middle by 2" X 4" posts.[5] There was no lengthwise support running the full length of the open area. Approximately fifteen sheets of plywood were used to cover the opening.
At the request of Texla Stevedore, Inc., Dixie sent Mr. Charles Medley to New Orleans to discuss the proper method of rigging the dredge so that it did not sag and become damaged during the lift onto the ship. Mr. Medley testified that the method of rigging which he proposed did not require that anyone stand on the plywood covering to attach the rigging used for the lift. In addition to discussing the proposed method, Mr. Medley made a sketch showing the attachment locations and left this sketch with Mr. Cook, the foreman for Texla, who was in charge of loading the dredge into the ship. Mr. Medley stated that he noticed that one sheet of the plywood had been removed so that the lack of undersupport was apparent to an observer. The fact that the plywood was only one-fourth inch thick was also apparent at this point in time. After fulfilling his job of instructing the Texla representative regarding the manner in which to lift the dredge onto the ship, Mr. Medley returned to St. Louis and, consequently, was not in New Orleans when the accident occurred.
Captain Murphy of National Bulk Carriers testified by way of deposition and stated that, although not directly involved in the loading operation, he had taken photographs as the rigging was being done. One of these pictures had been taken less than ten minutes before the accident. This picture shows that several sheets of the plywood had been removed. Three men are *1242 standing on the remaining plywood and a chain fall is about to come to rest on the plywood. Planks, resting only on the plywood and not extending from coaming to coaming, have been placed across the open space created by the removal of the plywood sheets.
Plaintiff’s fellow workers testified that immediately prior to the accident there were four of them on the plywood awaiting instructions from Mr. Cook who was to join them on the top of the dredge to supervise the rigging and lifting. Mr. Cook did not testify, having died as a result of the same accident. The stevedores described Mr. Cook as a large man, weighing approximately 300 pounds. The stevedores also testified that Mr. Cook had told them that the plywood was rather thin. When Mr. Cook arrived on the top of the dredge, he instructed the men to begin the rigging process and the men walked to the area where the planks had been placed to attach the chain fall around the suction pipe of the dredge. As the men converged on this area, the planks and/or plywood collapsed and the men fell several feet into the dredge.
None of the witnesses knew just why the additional sheets of plywood had been removed and the planks placed across the open space thus created. They speculated that the sheets were removed so that there would be easier access to the suction pipe and that the planks were placed to provide a stronger, safer place to walk. The photograph clearly shows, and no witness testified to the contrary, that these planks did not extend to the steel sides (coamings) of the dredge. Rather, the planks only reach from plywood to plywood.
Mr. Medley of Dixie introduced the sketch he had drawn to illustrate the method of rigging he had proposed. To rig in the suggested manner, it was not necessary that a stevedore stand on the plywood. Mr. Medley’s rigging plan contemplated that the stevedores would stand on the steel floor of the dredge and attach the chain fall to the suction pipe from that level rather than from the plywood above the pipe. Mr. Medley acknowledged that the plywood was only Vi inch thick and only strong enough to hold the one or two carpenters who had installed it in St. Louis. Mr. Medley emphasized that the plywood was not intended to serve as a floor from which the stevedores could work, that it was only meant to protect the interior parts of the dredge from weather and intruders during the trip from St. Louis to New Orleans and while the dredge was on the wharf waiting to be loaded in the hold of the ship. After the dredge was secured in the ship, the plywood would no longer be needed because the hold would be closed with watertight covers.
The trial judge held that plaintiff’s injuries were caused by the “joint and combined negligence” of Dixie Dredge Company and Mr. Cook. Plaintiff asserts another rationale for holding Dixie liable in addition to negligence in the use of thin plywood to cover the dredge. Plaintiff contends that liability attaches to Dixie under Article 2317 of the Civil Code which imposes responsibility for the damage occasioned by “things which we have in our custody.”
To recover under Article 2317, a plaintiff must show, inter alia, that the thing which caused the damage was in the care or custody of the defendant owner. In the instant case, Dixie had entrusted the dredge to other parties for shipment to its place of use. On the wharf in New Orleans, Dixie did not have control over the dredge. No Dixie representative was present when the accident occurred. Texla Stevedore, Inc., had full responsibility for loading the dredge into the ship. Texla exercised this responsibility to the degree that it even disregarded the suggested plan of rigging which had been requested from and proposed by Dixie.
Under the reality as it existed at the time plaintiff was injured, Dixie was not the party responsible for the dredge. Plaintiff has not shown that the thing which caused his injury was in the care or custody of Dixie. Dixie had transferred the custody of the dredge to Texla who bore such a relationship to the dredge as to itself have the care of it. Article 2317 does not support recovery for plaintiff.
*1243 Plaintiff’s assertion that Dixie is liable to him because it negligently covered the dredge with Vi inch plywood presents a closer question for our decision. As we explained in Hill v. Lundin, 260 La. 542, 256 So.2d 620, 622 (1972): “if the defendant’s conduct of which the plaintiff complains is a cause in fact of the harm, we are then required in a determination of negligence to ascertain whether the defendant breached a legal duty imposed to protect against the particular risk involved.” There is no doubt that the thin plywood was a cause in fact of plaintiff’s injury. The proper focus for our inquiry is whether Dixie breached a legal duty to protect plaintiff against the risk that five men and a piece of heavy machinery would be placed on admittedly weak plywood.
Mr. Medley of Dixie acknowledged that had he known that the stevedores would stand on the plywood to rig the dredge, he would have felt an obligation to warn them about the nature of the plywood and its limited purpose. Mr. Medley, however, had no such knowledge. Mr. Medley, instead, had provided Mr. Cook with a sketch showing the manner in which to rig the dredge and the procedure suggested did not require that stevedores stand on the plywood. Rather than follow the rigging plan suggested by Mr. Medley, the Texla foreman, Mr. Cook, devised and used a rigging plan of his own. To effectuate this plan, Mr. Cook had the stevedores stand on the plywood.
Texla carpenters removed several sheets of plywood for reasons unknown. Perhaps the stevedores needed a larger hole through which to feed the chains and cables of the chain fall. With these plywood sheets no longer in place, there was an opening across which the stevedores could not step. Texla carpenters placed boards across this open space. These planks were variously described as 2 inch boards, six to twelve inches wide, and several feet long. The boards, however, did not reach to the steel sides of the dredge; instead, the boards rested only on the adjacent sheets of plywood. Physically, the planks placed across the plywood did little more than add weight to the already insubstantial structure. Additionally, the planks created an illusion of safety and stability which realistically did not exist. The stevedores stated that they thought the planks had been placed in position to create a safe and strong place on which to walk. Texla through its officer Cook made an unwise choice of materials and their placement for use in the loading of the dredge onto the ship. Dixie cannot be blamed for the actions of Texla. Texla was a specialist in the field of loading ships.
Recognizing the unusual construction of the barge, Texla requested and received a proposed method of rigging. In addition to discussing the plan with the Texla representative, Mr. Medley from Dixie left a sketch of the suggested rigging with Mr. Cook. The stevedores testified that Mr. Cook warned them that the plywood was rather thin. Even knowing that the plywood was thin, Mr. Cook discarded the suggested rigging plan which would not have required the stevedores to be on the plywood. Instead, Mr. Cook used a substitute plan of his own which required the men to stand on the thin plywood.
We find the case before us similar to Hill v. Lundin, supra. In Hill, a building contractor had left a ladder standing against the side of a house after completing a repair job. An unknown party moved the ladder so that it was lying on the ground. Plaintiff, who worked for the homeowner, tripped over the ladder as it was on the ground. We held that the contractor was not liable to plaintiff because defendant had not breached a legal duty imposed to protect against the particular risk encountered by plaintiff. Rather, the risk encountered by the plaintiff, and which caused her injury, was the ladder in its position on the ground. The action of the third person created that risk. We noted that there was no evidence in the record tending to establish that defendant could have reasonably anticipated that a third party would move the ladder and leave it in the dangerous position. Consequently, defendant was not liable to plaintiff.
*1244 In the instant case, while the thin plywood was a cause in fact of plaintiff’s injury, the particular risk Bonura encountered was created by the action of a third party. Dixie proposed a rigging plan to be used by Texla. Texla specifically requested such a plan. For whatever reason, Mr. Cook decided to use another method of rigging, a method which required the stevedore to stand on the plywood. Dixie’s proposal would not have placed the stevedores in that location. Besides disregarding Dixie’s proposal for rigging, Mr. Cook, although he could see that the plywood upon which the planks rested was quite thin, created an illusion of safety by having planks placed in such a manner that the stevedores viewed them as a walkway. Like the third party in Hill who moved the ladder into the new position, Mr. Cook changed the conditions on the dredge and thus created the particular hazard legally responsible for plaintiff's injuries. Considering the totality of the circumstances, we hold that Dixie is not liable to plaintiff.

Decree

The judgment of the Court of Appeal, amending the district court judgment, is set aside. The judgment of the district court, insofar as it cast defendant Dixie Dredge Company in solido along with Commercial Union Insurance Company, is reversed. With reference to plaintiff’s claim against Dixie, plaintiff’s petition is dismissed with prejudice at plaintiff’s cost.
COURT OF APPEAL JUDGMENT SET ASIDE; DISTRICT COURT JUDGMENT REVERSED IN PART; PLAINTIFF’S PETITION DISMISSED IN PART.
LEMMON, J., concurs and assigns reasons.

. The Court of Appeal opinion states that “Dixie would be entitled to full indemnity from Cook’s insurer.” 381 So.2si at 1266. This indicates that Cook’s insurer, Commercial Union, must bear the entire judgment: a situation which would not occur unless Commercial were determined to be the defendant exclusively liable to plaintiff. Vis-a-vis themselves, parties liable in solido are each responsible for a virile share of the judgment.

. In this regard, we note that, although Commercial had paid the principal amount of the judgment, plaintiff had not received the legal interest due on that amount and therefore still had a real interest in the litigation.

.In Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the United States Supreme Court held that a stevedoring company must indemnify the shipowner cast in judgment to an injured longshoreman when his claim was based on the unseaworthiness of the vessel due to faulty loading by the stevedores. The Court reasoned that the stevedoring company had contracted to do the job in a workmanlike manner and its failure to do so was the cause of the claim against the vessel.

. But see note 2 supra and text infra.

. Some witnesses described these as “little sticks.”